Laura R. Hall
Jonathan Cho
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:   (212) 610-6300
Facsimile:   (212) 610-6399

*Counsel to the Foreign Representatives*
*of Greensill Capital (UK) Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| GREENSILL CAPITAL (UK) LIMITED (IN ADMINISTRATION),[1] | Case No. 21-_____ (___) |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING**

Christine Mary Laverty, Trevor Patrick O'Sullivan, and William George Edward Stagg are the duly-authorized representatives (the **Foreign Representatives**) of Greensill Capital (UK) Limited (**GCUK**), a debtor in administration under English law (the **English Proceeding**) pursuant to the Insolvency Act 1986 (the **Insolvency Act**), sealed and endorsed by the High Court of Justice, the Business and Property Courts of England and Wales, Insolvency and Companies List (the **English Court**).

The Foreign Representatives have commenced this chapter 15 case ancillary to the English Proceeding by filing an Official Form B401 and this *Verified Petition for Recognition of Foreign Proceeding* (together, the **Chapter 15 Petition**), with accompanying documentation, pursuant to

---

[1]   The last four digits of Greensill Capital (UK) Limited's Company Registration Number are 6173.

1

sections 1504 and 1515 of title 11 of the United States Code (the **Bankruptcy Code**) seeking the entry of an order substantially in the form annexed hereto as Exhibit A (the **Proposed Order**) recognizing the English Proceeding as a "foreign main proceeding" under section 1517 of the Bankruptcy Code and granting related relief.

The Foreign Representatives have, contemporaneously herewith, filed a *Memorandum of Law in Support of Verified Petition for Recognition of Foreign Proceeding* setting forth the legal argument for the relief sought in the Chapter 15 Petition (the **Memorandum of Law**).

In support of the Chapter 15 Petition, the Foreign Representative respectfully states as follows:

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1501, and the *Amended Standing Order of Reference of the United States District Court for the Southern District of New York*, dated January 31, 2012, Reference M-431. *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). Venue is proper in this District pursuant to 28 U.S.C. § 1410. The statutory predicates for the relief requested herein are sections 1504, 1509, 1515, 1517, and 1520 of the Bankruptcy Code.

### BACKGROUND

1. For a description of relevant English law, the Court is respectfully referred to the *Declaration of Katrina Mary Buckley in Support of Verified Petition for Recognition of Foreign Proceeding* dated August 18, 2021, and filed contemporaneously herewith (the **Buckley Declaration**). Unpublished or foreign decisions and orders cited in connection with the Chapter

2

15 Petition are annexed to the *Declaration of Laura Hall* dated August 18, 2021, and filed contemporaneously herewith (the **Hall Declaration**).

**A.    Introduction**

2.    GCUK was the main trading entity for the Greensill group, a global financial services firm consisting of Greensill Capital Pty Limited (**Greensill Pty**) and its various subsidiaries (the **Group**). GCUK was principally in the business of arranging supply chain and other working capital financing solutions for its customers by acquiring receivables, with related rights, and onselling such assets to investors either directly or in the form of receivables-backed notes issued by bankruptcy remote special purpose vehicles. These transactions were largely automated through the use of bespoke technology platforms developed by GCUK, either by itself or in partnership with third parties, that enabled high daily transaction volume and the completion of transactions within periods as brief as 24 hours. GCUK also served as the treasury company for, and provided financial support, management, and a range of other services to, the wider Group.

3.    Greensill Capital Management Company (UK) Limited (**GCMC**), GCUK's sister company in the UK, provided certain management services for GCUK and employed the vast majority of the employees involved in GCUK's business. GCMC is also the principal intermediate holding company within the Group and the parent company for twelve subsidiaries incorporated in the UK and elsewhere. Such subsidiaries include special purpose vehicles set up to originate transactions for GCUK, as well as certain operating companies in the UK and the US.

4.    The Group began experiencing liquidity pressure in 2020 and, towards the end of that year and continuing through early 2021, explored various recapitalization options in order to avoid the need for formal insolvency processes. These included, among other things, seeking to implement a restructuring and refinancing plan; mandating investment banks in relation to an

equity raise; seeking bridge financing and/or equity injections from existing shareholders; engaging an investment bank in relation to a structured finance facility backed by insured supply chain receivables; and exploring a sale of all or part of GCUK's business. These efforts were unsuccessful due to a number of factors, including, most significantly, the failure to renew insurance coverage critical to GCUK's origination of new working capital finance business, ultimately leading to the Group's insolvency and the commencement of formal insolvency proceedings for Group entities in multiple jurisdictions. In the UK, the directors of GCUK and GCMC applied to the English Court for the appointment of administrators in early March 2021, and the Foreign Representatives were appointed as joint administrators of both companies on March 8, 2021.

5.    The Foreign Representatives seek chapter 15 recognition of the English Proceeding as to GCUK in order to protect GCUK's assets and operations in the United States and stay the commencement or continuation of US litigation against GCUK while the Foreign Representatives continue to manage the affairs, business, and property of the company and devote their efforts to determining the best course for the administration. The Foreign Representatives have determined that it is not necessary at this juncture to seek such relief for GCMC.

B.    **Overview of GCUK**

   i.    **GCUK's Business**

6.    GCUK was a financial services company that helped businesses manage their working capital financing and, at its peak, was responsible for arranging up to approximately USD 200 million in financing per day. Summarized at a high level, its core business was the arrangement of working capital financing for its clients (**Clients**) by: (i) acquiring payment obligations (**Receivables**) associated with underlying customers or account debtors of such Clients and (ii)

4

funding such acquisition by onselling such Receivables to investors (**Investors**) either directly or in the form of Receivables-backed notes (**Notes**) issued by one of three bankruptcy remote special purpose vehicles within the Group: Hoffman S.à.r.l., Wickham S.A., and Lagoon Park Capital S.A (together, the **Issuers**).

7. GCUK's provision of working capital financing to Clients and acquisition of Receivables took three general forms:

    a. Supply chain finance, under which GCUK would arrange for the early payment of Client invoices at a small discount in return for an irrevocable payment undertaking from the relevant Client customer to pay the full amount of the original invoice in full on the original due date.

    b. Accounts receivable finance, under which GCUK would purchase Client accounts receivable owed by Client customer account debtors at a discount to face value.

    c. Future accounts receivable finance, under which GCUK would provide funding to Clients against future accounts receivable expected from specified Client customers.

8. Each of these models had a number of variations with different terms and conditions. But in each case, the fundamental transaction was that GCUK would essentially offer a Client up-front payment of, or for, a Receivable at a discount to face value with the expectation of realizing a profit when such Receivable was ultimately paid in full. The parties to which GCUK would have recourse for such payment could, in any given case, include the Client customer associated with the Receivable and/or the Client itself and Client-related parties (an **Obligor**).

9. The working capital financing would largely be funded with the proceeds of GCUK's onsale of Receivables to Investors. Such onsale would be effected either via direct sale of Receivables to Investors or, alternatively, through the Issuers, which acquired Receivables and issued Notes to Investors secured by such Receivables. Whether the immediate purchaser was an Investor or an Issuer, the sale of the Receivables would generally include the assignment of related security rights and recourse rights against the relevant Obligors, and payments were intermediated through GCUK such that neither Investors nor Issuers funded Clients directly. GCUK performed various ongoing administrative tasks in relation to each transaction, such as administrating collateral, collection, and payment, with the support of employees from GCMC. Investor participation in these programs was typically on an uncommitted basis.

10. GCUK's acquisition and onsale of Receivables was a largely automated process, using standardized form documents and a bespoke IT platform that allowed GCUK to close a high volume of transactions each day. Moreover, a transaction could generally be concluded within a single business day, minimizing the time in which GCUK would be required to keep assets on its own balance sheet before passing the risk of such assets on to Investors.

11. GCUK's German affiliate, Greensill Bank AG (**Greensill Bank**), and funds managed by affiliates of Credit Suisse AG (**Credit Suisse**), were significant investors in Receivables and Notes originated by GCUK. In particular, they hold almost all of the Receivables and Notes associated with sub-investment grade Clients that are supported by trade credit insurance policies, as discussed in the next section.

  ii. **Trade Credit Insurance**

12. GCUK's working capital financing programs relied heavily on the availability of trade credit insurance policies to support Receivables with a higher risk profile, such as those

associated with sub-investment grade Clients. Receivables in this category were onsold with the benefit of insurance coverage, and working capital financing relating to such Receivables were by far the most profitable part of GCUK's business, accounting for approximately 90% of GCUK's revenue each year. Receivables from investment-grade Clients, by contrast, did not typically require insurance, operated on much smaller margins, and only accounted for approximately 10% of GCUK's yearly revenue.

13. GCUK's main insurance policies were provided by The Bond & Credit Co., representing over USD 10 billion of cover across several policies (the **TBCC Policies**). Due in part to GCUK's inability to meet certain collateral requirements, negotiations towards the renewal of the TBCC Policies broke down in early 2021. As a result, the most significant of the TBCC Policies, representing approximately USD 4.6 billion of cover, expired on March 1, 2021, with six other TBCC Policies representing an additional USD 9 billion of cover due to expire over the course of 2021. While the expiration of the TBCC Policies does not affect coverage for Receivables originated during the period in which the TBCC Policies were valid, their expiration precludes coverage for new Receivables.

14. The TBCC Policies also represent significant contingent liabilities for GCUK that that are likely to crystallize in the near term. Each TBCC Policy consists of two inter-linked policies, one issued to Greensill Bank and Greensill Pty (a **Greensill Bank Policy**) and another issued to GCUK and Greensill Pty (a **GCUK Policy**). Greensill Bank and other Investors in assets supported by the TBCC Policies are loss payees under the Greensill Bank Policies and essentially benefit from 100% cover, i.e., full payment, in the event that an Obligor fails to make payment on a Receivable. The GCUK Policies, by contrast, are subject to a deductible specific to each Client, typically in the range of 5-10%, such that GCUK must bear the first loss. The GCUK Policies

7

further require GCUK to compensate TBCC, again typically in the range of 5-10%, for claims made under the Greensill Bank Policies, such that GCUK also effectively bears the first loss under the Greensill Bank Policies. In some cases, GCUK also agreed to directly indemnify certain loss payees under the TBCC Policies.

15. While GCUK has an additional USD 3.4 billion of cover under other policies available through a syndicate of other insurers, these policies have never been used because they do not provide full cover to the loss payees and, instead, require the loss payees to bear a first loss deductible. While this issue could be mitigated if GCUK were to provide cash collateral sufficient to cover any first loss deductible liability, GCUK has been unable to do so.

### iii. GCUK's Corporate Structure and Center of Main Interests

16. GCUK is a wholly-owned subsidiary of Greensill Pty and a private limited company incorporated and registered in England and Wales. Its former registered office was located at One Southampton Street, Covent Garden, London, WC2R 0LR, and its present registered office is located at 4 Hardman Square, Spinningfields, Manchester, M 3 3EB.

17. Throughout its existence, GCUK has principally operated out of – and had its center of main interests in – England and Wales. GCUK's working capital financing arrangements have principally been structured out of that jurisdiction and the contracts governing such arrangements, including the Notes, are predominantly governed by English law. Prior to the administration, GCUK's management was located in England and Wales and its operations were historically supported by employees of GCMC, which is also an English entity.

18. Since the commencement of the English Proceeding, GCUK has been administered by the Foreign Representatives out of London.

> **iv.** **Assets and Operations in the United States**

19. GCUK's principal US assets consist of claims against US-based Obligors and the Group's principal US place of business was in New York.

**C.    Events Leading to the English Proceeding**

20. GCUK's current situation follows in large part from its failure to extend the TBCC Policies ahead of their expected 2021 expirations. Because the availability of adequate insurance cover is critical to GCUK's ability to offer working capital financing to the sub-investment grade Clients that account for the substantial majority of its revenue, the loss of such cover dealt a significant blow to its origination of new working capital financing business and Receivables.

21. Following GCUK's disclosure that the TBCC Policies would not be renewed, Credit Suisse and other significant Investors – who generally invested on an uncommitted basis – indicated that they would cease making further investments in insured Receivables and Receivables-backed assets. The resultant negative publicity, in turn, eroded the confidence of other Investors and dried up the market for assets originated by GCUK, leading it to cease trading and, therefore, cease generating revenue.

22. The inability to arrange new financing also exacerbated GCUK's exposure to Clients that relied on continued access to working capital financing from GCUK to avoid defaulting on their obligations. Not only did GCUK in some cases hold Receivables associated with such Clients on its own balance sheet, but defaults in relation to insured Receivables could crystallize GCUK's contingent first loss deductible liability under the TBCC Policies and, if applicable, any direct indemnities it may have agreed to provide to loss payees.

23. GCUK's exposure to the Gupta Family Group Alliance (**GFG**), an international conglomerate, with interests in steel, mining, aluminum, financial services, real estate, and other

industries, has been particularly problematic. GFG is responsible for a significant proportion of GCUK's sub-investment grade business and there was a concern that it would become insolvent in the absence of continued liquidity from the working capital financing provided by GCUK. A GFG default would have significant repercussions not only for Investors that hold related Receivables and Receivable-backed assets, but for GCUK itself, which is owed material fees by GFG, holds Receivables associated with GFG on its own balance sheet, and has a large contingent first loss deductible liability. Indeed, in 2020, Greensill Bank's exposure to GFG as an Investor became the subject of increasing attention from German watchdogs and financial regulators, resulting in GCUK providing Greensill Bank with cash collateral in November and December 2020 in order to facilitate Greensill Bank's continued acquisition of GFG-related assets and thereby avoid a GFG default scenario. Since GCUK ceased trading, GFG Obligors have stopped making payments in connection with their Receivables.

24.     Beginning in late 2020, when these issues began coming to the forefront, GCUK and Greensill Pty devoted significant effort to investigating potential sources of debt or equity financing that might raise sufficient liquidity to reduce the Group's exposure to GFG and meet the collateral requirements for renewing the TBCC Policies. Specific steps taken by GCUK and Greensill Pty during this period included mandating investment banks in relation to an equity raise and approaching an existing shareholder for a bridge facility, liquidity facility, or equity financing, both of which ultimately fell through due to regulatory concerns and/or concerns about GFG concentration risk. GCUK and Greensill Pty also engaged an investment bank to arrange and coordinate a liquidity facility backed by insured Receivables originated from GFG and structured through a special purpose securitization vehicle, though this structure ultimately failed because it was predicated on the renewal of the TBCC Policies.

25. GCUK's directors concurrently explored the potential sale of GCUK, or of some or all of its assets, on a solvent or insolvent basis. In particular, GCUK's directors focused on a potential sale of GCUK's intellectual property ahead of the commencement of any formal insolvency process because (i) the value of those assets would be severely impacted if GCUK ceased to originate new business for a prolonged period and (ii) the origination of new business was considered untenable in the context of an administration due to GCUK's inability to originate new sub-investment grade assets without insurance cover and the impact GCUK's insolvency would likely have on both Investor and Client confidence and its ability to make representations and warranties under its existing transaction documentation.

26. However, these efforts were also unsuccessful. The universe of potential purchasers for the business was limited from inception due to the complex nature of the transactions, the level of funding required, the desire to minimize negative publicity, and the need to find a purchaser of sufficient quality to provide confidence to the market. Of the three potential purchasers that were ultimately selected and approached, only one was interested in undertaking detailed diligence within the timeframe required. And although this party made an initial offer and executed an exclusivity agreement, it subsequently reduced its offer by a significant amount and negotiations ended on March 11, 2021.

27. The director of GCUK, Alexander David Greensill, and the directors of GCMC, Alexander David Greensill and Alastair Kenneth Eadie, applied to the English Court for the appointment of administrators. The English Court appointed the Foreign Representatives as joint administrators for GCUK and GCMC on March 8 2021, in accordance with the Insolvency Act.

28. Since their appointment, the Foreign Representatives have managed the affairs, business, and property of GCUK in order to achieve an orderly wind-down and facilitate the

recovery of assets for the benefit of creditors. Actions that the Foreign Representatives may take or are taking include but are not limited to:

a. continuing business as usual for trading operations (but, for the avoidance of doubt, not the origination of new business), Obligor receipts, and payments to Investors, including GCUK as principal or third-party Investors, where appropriate arrangements are put in place;

b. agreeing and finalizing the form of support with Investors to recover costs incurred in connection with GCUK's continuing efforts to assist with recovery of assets;

c. dealing with any defaulting Obligors and taking steps to protect the position of GCUK or Investors;

d. dealing with all trade insurance regulated matters, including submitting regular reports as required by the terms of the policies and preparation and submissions of claims if Obligors default;

e. processing of insurance claims for defaulting Obligors;

f. retaining employees predominantly for the purposes of asset recoveries;

g. maintaining complex IT infrastructure to facilitate the realization of GCUK assets and third-party assets where appropriate;

h. continuing assistance with subsidiaries to wind up or facilitate a sales process, as applicable, and realize value where possible;

i. continuing to liaise with agents regarding the disposal of remaining assets;

j. paying administration expenses;

      k. agreeing the claims of the unsecured and preferential creditors and payment of a dividend, if future realizations make this feasible;

      l. paying distributions to the secured creditors of GCUK; and

      m. finalizing GCUK's tax affairs, including completion of corporation tax and VAT returns and settlement of any post administration liabilities, and complying with statutory and regulatory obligations, including investigations.

In summary, the Foreign Representatives' efforts include not only realization of GCUK's own assets, but taking such steps as it deems appropriate – including the maintenance of relevant operations and systems for asset recovery – to facilitate recoveries from Obligors and under the insurance policies for the benefit of Investors.

**D.  Litigation in the United States**

29. On March 15, 2021, Bluestone Resources Inc. (**Bluestone**) and certain of its affiliates and principals (collectively, the **Bluestone Plaintiffs**) filed a complaint in the United States District Court for the Southern District of New York against GCUK and two of GCUK's former officers, Alexander David Greensill and Roland Hartley-Urquhart. The case is pending before Judge Furman and is captioned *Bluestone Resources Inc. et al v. Greensill Capital (UK) Limited et al*, 1:21-cv-02253-JMF (S.D.N.Y. 2021).

30. The Bluestone Plaintiffs are Obligors in relation to working capital financing provided by GCUK to various entities in the Bluestone group, and the complaint alleges claims for breach of contract, fraud, various breaches of fiduciary duties, and related issues arising out of GCUK's business relationship with the Bluestone Plaintiffs. The defendants' answer to the

complaint is currently due on September 13, 2021, but the Foreign Representatives seek to have the Chapter 15 Petition heard before that date.

## RELIEF REQUESTED

31. By this Chapter 15 Petition, the Foreign Representatives seek (i) the recognition, pursuant to section 1517 of the Bankruptcy Code, of the English Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code and (ii) all relief afforded to foreign main proceedings automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, including, without limitation, application of the automatic stay imposed by section 362 of the Bankruptcy Code.

## BASIS FOR RELIEF

32. For the reasons more fully discussed in the Memorandum of Law, the English Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

   a. the English Proceeding is: (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) pending where GCUK has the "center of its main interests" and is therefore a "foreign main proceeding" within the meaning of section 1502(4), in satisfaction of section 1517(a)(1);

   b. the Foreign Representatives are the duly appointed "foreign representatives" of GCUK within the meaning of section 101(24) of the Bankruptcy Code and are each a "person" within the meaning of section 101(41), in satisfaction of section 1517(a)(2); and

       c.   the chapter 15 case was properly commenced in accordance with sections 1504 and 1509 of the Bankruptcy Code and the Chapter 15 Petition meets the requirements of sections 1504 and 1515, in satisfaction of section 1517(a)(3).

33.    Recognizing the English Proceeding would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code. In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. Thus, the conditions for mandatory recognition of the English Proceeding under section 1517 of the Bankruptcy Code are satisfied.

34.    Under section 1520 of the Bankruptcy Code, upon recognition of the English Proceeding as a "foreign main proceeding" section 362 of the Bankruptcy Code automatically takes effect with respect to GCUK and the property of GCUK within the territorial jurisdiction of the United States.

## CONCLUSION

WHEREFORE, the Foreign Representatives respectfully request that this Court grant the Chapter 15 Petition and enter the Proposed Order recognizing the English Proceeding as a "foreign main proceeding" and granting such other relief as is appropriate under the circumstances.

Dated: New York, New York
       August 18, 2021

By: /s/  Laura R. Hall
Laura R. Hall
Jonathan Cho
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 610-6300
Facsimile:    (212) 610-6399
laura.hall@allenovery.com
jonathan.cho@allenovery.com

*Counsel to the Foreign Representatives of Greensill Capital (UK) Limited*

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Trevor Patrick O'Sullivan declares as follows:

I have been appointed and authorized to act as foreign representative of Greensill Capital (UK) Limited. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding*.

I have read such document, and am informed and do believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __18th__ day of August 2021, in __England, United Kingdom__

_____

# EXHIBIT A

Proposed Order